## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

SANDRA EDWARDS,          )
                                )
     Plaintiff,             )           CASE NO. 3:11-00021
                                )           JUDGE HAYNES
v.                           )
                                )
THE LINCOLN NATIONAL LIFE    )
INSURANCE COMPANY,         )
                                )
     Defendant.          )

## M E M O R A N D U M

Plaintiff, Sandra Edwards, filed this action under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(1)(B) against the Defendant Lincoln National Life Insurance Company ("Lincoln National") that administers the employee welfare benefit plan for Alive Hospice, Inc., Plaintiff's former employer. In sum, Lincoln National determined that Plaintiff's application for benefits under that plan failed to establish her eligibility for "totally disability" benefits. After administrative appeals, Plaintiff filed this action to which the Defendant filed its answer and the administrative record of Plaintiff's disability application process.

Before the Court are the parties' motions for judgment based upon the administrative record of Plaintiff's application for long term disability ("LTD"). (Docket Entry Nos. 23 and 25).

For the reasons set forth below, the Court concludes that the administrative record reflects that Plaintiff's condition of fibromyalgia, coupled with her other documented medical diagnosis, causes pain. As a matter of law, fibromyalgia is a condition that cannot be documented by medical tests. This condition and the opinions of Plaintiff's primary treating

physician and other treating physicians establish that Plaintiff cannot work and render Lincoln National's reliance on its consultants arbitrary and capricious.

## A. Review of the Record

Plaintiff was a senior payroll specialist at Alive Hospice in Nashville, Tennessee. (Docket Entry No. 12-4, Administrative Record 00708). Plaintiff's employment at Alive Hospice ended on August 5, 2009. Plaintiff submitted a claim for LTD benefits asserting she was totally disabled due to chronic pain in her neck, lower back, legs, hips, shoulders, and hands that rendered her unable to stand, to sit or to focus. Id. at 00693. Plaintiff reported that her job at Alive Hospice required her to sit at a computer and perform data entry a great deal of the time, but she admitted that she could get up from the computer and move, as needed. (Docket Entry No. 12-1, Administrative Record 00234). Plaintiff walks with the assistance of a cane or a walker. (Docket Entry No. 12-2, Administrative Record 00327).

Alive Hospice has an employee welfare benefit plan (the "Plan") providing LTD benefits to eligible employees. Under the Plan, LTD benefits are funded through group LTD insurance policy number 000010014103 issued by Jefferson Pilot Financial Insurance. (Docket Entry No. 12-1, Administrative Record 00038-00070). Lincoln National is the successor to Jefferson Pilot and administers Plaintiff's claims for LTD benefits under the LTD Policy. Id. at 00042, 00048-50.

## 1. Plaintiff's Medical Records

According to the administrative record of Plaintiff's disability application, Plaintiff's medical records reveal that Plaintiff was evaluated and treated by multiple physicians for complaints of back and neck pain, rashes, carpel tunnel syndrome, obesity, gastrointestinal distress, chest pain, and other ailments. Plaintiff underwent multiple MRIs of her back and head

in 2001 and 2002 after her complaints of headaches and back pain and the MRI revealed degenerative disc disease, but without acute abnormality. (Docket Entry No. 12-4, Administrative Record 00638, 00634; Docket Entry No. 12-3, Administrative Record 00629, 00626, 00623).

On October 9, 2009, Plaintiff reported to Dr. Wesley L. Coker pain in her left knee after slipping on some oatmeal on the floor. (Docket Entry No. 12-1, Administrative Record 00187). Dr. Coker examined Plaintiff's knee and found a mild effusion, but good stability, no ecchymosis nor evidence of skin disruption, deenopathy with good medial, lateral, and rotational stability. Id. Dr. Coker noted that her patella tracks well and Plaintiff had good functioning of her quadriceps, but she complained of pain with range of motion. Id. Dr. Coker's impression cited contusion of the left knee for which he prescribed DepoMedrol, a corticosteroid for inflammation. Id. Dr. Coker did not comment about Plaintiff's ability to work. Id.

In October 2002, Plaintiff underwent EMG and nerve conduction studies for the complaints of lower right extremity pain, numbness and parasthesias. (Docket Entry No. 12-3, Administrative Record 00604). The results from these examinations were normal except for questionable peroneal neuropathy. Id. In November 2002, Plaintiff experienced edema in both legs and her physician recommended a diuretic and elevation of her feet. Id. at 00601. In 2002, Plaintiff complained to her physician of constant chest pain of three week duration, pain in her arm as well as chronic leg pain and swelling. Id. at 00591. Plaintiff's physician expressed concern about Plaintiff's weight and lack of exercise, but confirmed the absence of a heart attack. Id. at 00591, 00585.

In October 2004, Plaintiff complained of pain, popping and swelling in her knees and left elbow. Id. at 00564. Dr. Jeffrey Lawrence, Plaintiff's physician, recommended exercise for

tennis elbow and the wearing of a knee brace. Id. at 00564. In March 2005, Plaintiff had a recurrence of leg swelling. Id. at 00555. In the spring of 2005, Plaintiff had knee replacement surgery. Id. at 00548.

Weeks after that surgery, Dr. Joseph Houston, a rheumatologist, examined Plaintiff for her generalized complaints and found myalgia and arthralgia with an underlying autoimmune disorder, possible lupus. Id. at 00536-38. After testing, Dr. Houston ruled out lupus or any other underlying autoimmune rheumatic disease for Plaintiff's pain and lack of energy. Id. at 00537. Plaintiff's primary care physician, Dr. Sally Burbank noted that Plaintiff had experienced significant weight gain over the past seven years, from 237 pounds in 1998 to 254 pounds in June 2005, and 261 pounds at her July 2005 physical examination. Id. at 00536-38.

As to Plaintiff's complaints of pain, Dr. Houston noted "a suggestion of exaggerated pain behavior." Id. at 00536. Dr. Houston opined that Plaintiff's delayed recovery from the knee replacement surgery may contribute to her symptoms of myofascial pain and her depression. Id. at 00537. Dr. Houston recommended discontinuation of Plaintiff's medication Plaquenil for possible lupus. Id. Dr. Houston opined that Plaintiff "is going to be a pain management challenge" and recommended psychological counseling as part of the pain management strategy. Id. Plaintiff's medical records do not reflect any psychological counseling.

In early 2006, Plaintiff had a laminectomy and her examination four weeks after surgery revealed that Plaintiff was "pain free." Id. at 00509. In March 2007, however, Plaintiff returned to Dr. Vaughan Allen in a wheelchair, complaining of low back pain and the inability to put weight on her left leg. Id. at 00493. Plaintiff cited significant increase in pain of the past week, as well as left leg weakness, numbness, burning and tingling to her left groin and to the left anterior thigh. Id. Plaintiff left work. Dr. Burbank reported that she would be able to return to

work in the near future. Id. Plaintiff returned to Dr. Allen on June 8, 2007 and by her August 2007 examination, Plaintiff was walking well and Dr. Burbank placed her on an exercise program. Id. at 00489, 00490.

In the fall of 2007, Dr. Burbank, Plaintiff's primary care physician, characterized Plaintiff's condition as a flare-up of lupus. Id. at 00483. Dr. Burbank sent Plaintiff to Dr. Leslie Cuevas, a rheumatologist, but Dr. Cuevas did not discern any evidence of lupus. Id. at 00482-83. Dr. Burbank then opined that Plaintiff had fibromyalgia and a possible underlying sleep disorder. Id. at 00479-80. In January 2008, Plaintiff had a blood clot in her right leg. Id. at 00367. Plaintiff was told to use crutches and minimize walking on the leg to allow her blood time to dissolve the clot.

Over the next few months Plaintiff's weight continued to increase with inactivity and Plaintiff requested gastric bypass surgery. Id. at 00357. Plaintiff's insurance would not cover that surgery unless Plaintiff was unable to lose the weight on her own. Id. Plaintiff admitted that she was addicted to sweets and sweet drinks, like Coca-Cola. Id. Plaintiff's medical records do not reflect any further pursuit of gastric bypass surgery.

In early 2009, Plaintiff complained of pain in all joints, shoulders, and hips that prevented her from sleeping. Id. at 00332. Plaintiff described pain when she gripped a pencil or stuffed envelopes. Id. at 00332. Plaintiff provided the following history of her ailments.

February 26, 2009

| All symptoms |
| --- |
| |
| Headache – 4 Weeks |
| Neck |
| Left shoulder Blade pain moving to Left should and down left Arm and hand |
| Can't raise left arm |
| Extreme pain in both hands – can't write well, hold steering wheel etc. |

| |
|---|
| Left Hip pain all the time |
| Right Hip pain most all the time |
| Left Leg pain running down into foot |
| This is in addition to the burning nerve pain from Left Hip and leg caused by back problem |
| Right leg pain from Blood clot with swelling in both left but especially right |
| Both feet pain |
| Such severe pain in legs that I can't stand for more than 5 minutes without feeling like I'm going to fall |
| Right should pain most every week |
| Stomach overlaps and causes painful raw sores and skin |
| RASH breakouts when cold air or water touches me … Looks like an allergic reaction |
| Back hurts 24/7 |
| Left Knee hurts horribly, and right one that was replaced has been hurting lately |
| Can't sleep on the left side at all, have problems sleeping at all because of the enormous pain |
| |
| Daily functions getting more impossible to do |
| Examples |
| Can't reach out driver's side window to get mail/to go bag anything |
| Can't do personal hygiene well |
| Can't walk long enough to shop for groceries/all fun shopping stopped a long time ago |
| Can't get dressed without help for socks or shoes that don't slip on |
| Can't pick up anything from floor without grabber/if light enough for the grabber |
| Can't clean i.e., vacuum, mop, sweep, do anything that involves lifting or getting down on knees |
| Can't clean tubs, pick up pet supplies or pets anymore |
| |

Id. at 00331.

Dr. Burbank again referred Plaintiff to a rheumatology clinic for an evaluation of Plaintiff's chronic pain and fibromyalgia. Id. at 00330. Dr. William B. Kurtz, II of the Tennessee Orthopedic Alliance examined Plaintiff for her left shoulder pain. Id. at 00327. Plaintiff told Dr. Kurtz that her shoulder pain existed for a month or two; that her left knee pain was for the last six months; and that she had chronic lower back pain. Id. Dr. Kurtz's diagnoses were adhesive capsulitis in Plaintiff's left shoulder as well as a rotator cuff tear in the left

shoulder. Id. at 00328. Dr. Kurtz scheduled Plaintiff for an MRI and therapy for her left

shoulder. Id. In March 2009, Dr. Kurtz discussed Plaintiff's operative and non-operative

options for the rotator cuff tear and her arthritis. Plaintiff responded that she would probably

continue with non-operative treatment. Id. at 00326.

In mid-April 2009, Plaintiff had a chest x-ray, hepatobitary scan and abdominal

ultrasound based on her complaints of chest pain and abdominal pain. Id. at 00318-23. The tests

were normal, but the x-ray revealed degenerative dorsal spine change. Id. at 00321-24.

Plaintiff also consulted Dr. Chad Price for a third opinion about her left shoulder. Id. at

00315. Plaintiff cited weakness in overhead activities and weakness, pain and lack of motion in

her shoulder, precluding elevating her arm. Id. Plaintiff described the pain as constant, awaking

her from sleep. Id. Plaintiff experienced this pain for approximately one year. Id. Plaintiff

received physical therapy and was pleased with the results. Id. Dr. Price rescheduled an

appointment to review Plaintiff's last MRI, but Plaintiff's medical records do not reflect

Plaintiff's return visit to Dr. Price.

In May 2009, Dr. Sallaya Chinratanalab, a rheumatologist evaluated Plaintiff for

fibromyalgia. Plaintiff explained the history of her chronic pain, arthritis, and fatigue and was

convinced that she had lupus. Id. at 00311. After an evaluation, Dr. Chinratanalab

recommended "regular exercise," id. at 00313 and encouraged aquatic therapy. Plaintiff

responded that exposure to cold water or cold temperature would cause a rash. Id. Dr.

Chinratanalab's diagnosis was fibromyalgia for which she recommended a sleep evaluation to

rule out a possible sleep disorder. Id.

On June 4, 2009, Plaintiff returned to Dr. Allen with "a lot of pain in her neck." (Docket

Entry No. 12-4, Administrative Record 00687). Dr. Allen noted that Plaintiff has "C5-6

pathology with a modest stenosis," and stated that "[s]he may eventually have to have something done there, but I would like if at all possible to continue to treat her in a symptomatic fashion." Id. Dr. Allen recommended a follow-up examination in a few months after physical therapy. Id.

On June 22, 2009, Plaintiff saw an unidentified health care provider with complaints of bad neck pain and severe lower back pain. (Docket Entry No. 12-2, Administrative Record 00310). Plaintiff told the provider of Dr. Allen's recommended physical therapy and possible surgery, id. and fluid of her knees, fibromyalgia diagnoses as well as possible lupus. Id.

In July 2009, Plaintiff's physical therapy evaluation reported a "long-standing history of cervical and trapezial pain." (Docket Entry No. 12-1, Administrative Record 00234). The physical therapy provider recommended two physical therapy sessions per week for the next four weeks. Id. at 00235. Plaintiff did not adhere to this schedule and failed to return for her next session until August 27, 2009, citing her inability to exercise because of her pain. Id. at 00231. Plaintiff, however, reported some improvement in her condition. Id. at 00221.

On August 27, 2009, Dr. William Leone, a pain management physician examined Plaintiff whom he described as "an alert, pleasant, cooperative woman who demonstrated appropriate speech and affect." (Docket Entry No. 12-2, Administrative Record 00303). Dr. Leone found sensation in Plaintiff's left lateral thigh as well as in her hands and feet. Dr. Leon recommended electromyogram (EMG") studies to rule out radiculitis and directed Plaintiff to return in two weeks after her MRI results to determine, if she needed a posterior column workup. (Docket Entry No. 12-4, Administrative Record 00678). Dr. Leone recommended continuation of Percocet for Plaintiff's pain and Plaintiff stated "this did control her pain reasonably well." (Docket Entry No. 12-2, Administrative Record 00303). Plaintiff's August 27, 2009 EMG study revealed early right carpal tunnel syndrome, but was otherwise normal. (Docket Entry No. 12-2,

Administrative Record 00686).  Dr. Leone did not restrict Plaintiff activities nor opine that Plaintiff was unable to work.  (Docket Entry No. 12-2, Administrative Record 00303; Docket Entry No. 12-2, Administrative Record 00686, 00678).

On December 7, 2009, Dr. Allen examined Plaintiff and his notes of that visit reflect that he spent "a good deal of time with her" and wrote "She has very significant, long-term chronic pain.  I think there are a number of things that we could do to help, but unfortunately, I think she best would be served to see if we could work through pain management and help her there.  I will set this up and then see where to head."  (Docket Entry No. 12-4, Administrative Record 00672).

In May 2010, Dr. Burbank referred Plaintiff to Dr. Allen to evaluate her complaints of increased numbness and tingling in her arms radiating from her shoulders to her hands.  Plaintiff described this numbness and tingling as plaguing her "all night, every day."  Dr. Allen's nurse practitioner noted Dr. Allen's recommendation of pain management treatment, but Plaintiff "does not wish to be treated in pain management."  (Docket Entry No. 12-1, Administrative Record 00215).  Dr. Allen ordered a new cervical MRI that revealed degenerative disc disease as did a prior MRI.  Id. at 00214.  Dr. Allen also ordered an EMG study that was abnormal, showing right carpel tunnel syndrome as previously diagnosed.  Id. at 00212.  There was not any evidence of carpal tunnel syndrome on Plaintiff's left or any generalized peripheral neuropathy of cervical radiculopathy.  Id.  After these EMG studies, Dr. Allen concluded that mild carpal tunnel syndrome was the more likely cause of Plaintiff's numbness and tingling rather than the cervical spine pathology revealed by the MRI.  Id. at 00210.

In September 2010, Plaintiff visited Dr. Burbank complaining of worsening back pain that radiated to her right hip and leg to the knee.  Id. at 00093.  Dr. Burbank's notes reflect

Plaintiff "[h]as to sit or lay down when it hurts for several days." Id. Dr. Burbank opined that water aerobics would help Plaintiff's condition, but Plaintiff cited cold water as causing a skin rash. Id.

## 2. Lincoln National's LTD Policy

Alive Hospice's LTD Policy specifically authorizes Lincoln National to "manage this LTD Policy and administer claims under it" and to "interpret the provisions and resolve questions arising under this [LTD] Policy." Id. at 00050. This grant of discretion includes:

(1)    establish and enforce procedures for administering this [LTD] Policy and claims under it;

(2)    determine Employees' eligibility for insurance and entitlement to benefits;

(3)    determine what information the Company reasonably requires to make such decision; and

(4)    resolve all matters when a claims review is requested.

Id. Lincoln National's decisions are "conclusive and binding," but Plaintiff had the right to request review by the state insurance department or to initiate legal action. Id. at 00050.

For Total Disability benefits, the LTD Policy provides a monthly benefit if the employee: "(1) is Totally Disabled; (2) requires the regular attendance of a Physician; and (3) submits proof of continued total disability, at the Total Disability, at the Insured Employee's expense, to the Company upon request." Id. at 00056. The terms "Total Disability" or "Totally Disabled" include employee with an injury or sickness who is unable:

1.    during the Elimination Period and the Own Occupation Period, to perform each of the main duties of the Insured Employee's regular occupation; and

2.    after the Owen Occupation Period, perform each of the main duties of any gainful occupation for which the Insured Employee's training education or experience will reasonably allow.

Id. at 00046. The "Elimination Period" is defined as "90 calendar days of Disability caused by the same or related Sickness or Injury, which must be accumulated within a 180 calendar day period." Id. at 00041. The "Own Occupation Period" is "a period beginning at the end of the Elimination Period and ending 36 months later." Id. at 00041.

Plaintiff submitted her application for LTD benefits with Dr. Allen's letter dated August 6, 2009 stating that "Ms. Edwards will be disabled from work for an undetermined amount of time." Id. at 00233. Plaintiff also submitted her medical records, letters from Plaintiff's other health care providers, completed questionnaires and an attending physician's statement. Dr. Burbank, Plaintiff's primary care physician completed a "Comprehensive Medical History and Exam," dated August 4, 2009 and listed Plaintiff's "chief compliant" as fibromyalgia, lumbar disc degeneration, rash, obesity, migraines, and as a "problem list" cited severe osteoarthritis with obesity, depression, esophagitis, fluid, and blood clot. (Docket Entry No. 12-2, Administrative Record 00305). In the "functional status" section of this form, Plaintiff identified activities that she had difficulty with, such as grocery shopping, dressing/bathing, housekeeping, getting out of chairs, and walking independently. Id. at 00306. Plaintiff's activities without difficulty were driving, paying bills, and cooking meals. Id.

Dr. Allen's attending physician's statement on November 19, 2009 identified his diagnoses of Plaintiff as lumbar degenerative disc disease and cervical radiculopathy, with subjective findings of back and neck pain. (Docket Entry No. 12-4, Administrative Record 00691). Dr. Allen cited a MRI that showed "a fair amount of degenerative disc disease" and stenosis at C5-6 canal. Id. Dr. Allen considered Plaintiff was ambulatory with improvement. Id. at 00692.

By letter dated January 13, 2012, Lincoln National notified Plaintiff that she was ineligible for LTD benefits because she was not totally disabled, as defined in the LTD Policy. (Docket Entry No. 12-2, Administrative Record 00285-91). According to Lincoln National, to be considered "Totally Disabled" under the LTD Policy, Plaintiff had to prove that she was unable to perform the main duties of her occupation as performed in the national economy, not her specific job. Id. at 00288. Lincoln National reviewed Plaintiff's written job description and Alive Hospice's description of Plaintiff's job duties and compared those with the Department of Labor's Dictionary of Occupational Titles. Plaintiff's "regular occupation" was a payroll clerk, a sedentary occupation. Id. at 289. As to Dr. Allen's restrictions of sitting or standing for no longer than thirty minutes at a time and Plaintiff's need to stretch and reposition as needed throughout the work day, Lincoln National deemed these restrictions consistent with a sedentary occupation. Id. Accordingly, Lincoln National determined that under the plan Plaintiff was not "Totally Disabled" from her own occupation and, therefore, was not entitled to LTD benefits. Id.

With counsel, Plaintiff appealed Lincoln National's benefit determination with a "Medical Opinion Form" completed by Dr. Burbank on July 6, 2010. (Docket Entry No. 12-1, Administrative Record 00126-28). In this form, Dr. Burbank listed her diagnoses of Plaintiff's condition. Plaintiff's limitations and restrictions Dr. Burbank's diagnoses were as follows:

(1) Fibromyalgia – ache all over

(2) Severe osteoarthritis knee – can't stand > 5-10 min

(3) Severe peripheral edema – can't stand/sit > 2 hours without laying down

(4) Severe degenerative disc disease of lumbar and cervical discs

(5) Cervical spinal stenosis – weakness and pain in arms

(6) Carpal tunnel – numbness and dropping things with hands

Id. at 00126.

As to Plaintiff's subjective complaints, Dr. Burbank stated that the MRI scans confirm spinal stenosis and disc disease; that the EMG confirms carpal tunnel; and that the x-rays confirm osteoarthritis. Id. at 0127. Dr. Burbank cited Plaintiff's condition as causing lapses in memory and concentration to preclude reliable work and describing Plaintiff as "scatterbrained" with a propensity for mistakes. Id. at 00127. Dr. Burbank opined that Plaintiff was unable to drive safely, but documents filed concurrent with her claim in August 2009 reflect that Plaintiff was driving without difficulty. (Docket Entry No. 12-2, Administrative Record 00306).

Plaintiff opined that she requires approximately three hours of bed rest throughout the day and that she "[h]as to keep changing positions so back doesn't stiffen, legs swell badly, joints stiffen and ache. Cannot stay in any one (1) position (i.e., sit, stand, walk very long)." Plaintiff took Percocet for years prior to her application for disability benefits. (Docket Entry No. 12-1, Administrative Record 00126). Plaintiff also submitted a letter from Dr. Cuevas dated June 6, 2010, stating, in pertinent part:

> I have been asked to write a letter on behalf of Sandra Edwards regarding her disability. She is a patient that I have been following since October 31, 2007. She carries a diagnosis of fibromyalgia syndrome. Fibromyalgia is a syndrome which causes widespread pain, fatigue, difficulty sleeping, and is often associated with mood disturbance. Her last visit with me was on June 3, 2010. She continues to have widespread pain. She requires chronic medication.
>
> X-rays in July of 2009 also showed osteoarthritis of the hands and some changes that could be consistent with inflammatory arthritis. The patient is on Plaquenil for inflammatory arthritis.

(Docket Entry No. 26-1 at 19). Dr. Cuevas, however, did not rate the severity of Plaintiff's pain, the impact of the "chronic medication" or any functional impairment caused by Plaintiff's fibromyalgia. Id. at 00209.

In a letter dated March 16, 2010, Dr. Coker, who performed Plaintiff's knee replacement surgery, did not offer an opinion about Plaintiff's ability to work, but wrote "I also understand that you have applied for disability insurance and orthopedically there is no question that you have had a right knee replacement and you need to have a left knee replacement and then you have an inflammatory arthritis that involves multiple joints in both upper and lower extremities." Id. at 00194. Dr. Coker's records do not reflect any restrictions or limitations. Id. at 00186. As to Plaintiff's osteoarthritis in her left knee, Dr. Coker recommended that Plaintiff return on an as needed basis. Id.

During Plaintiff's first level appeal, Lincoln National secured an independent peer review. Dr. Milton Klein who is board certified in physical medicine and rehabilitation, disagreed with the restrictions and limitations imposed by Plaintiff's physicians despite Plaintiff's diagnoses of fibromyalgia, diffuse osteoarthritis of the spine, total right knee replacement, a partial left rotator cuff tear, and mild right carpal tunnel syndrome. In particular, Dr. Klein stated "there is no associated functional range-of-motion impairment and no documented neurologic impairment to support the attending physicians' work activity restrictions and limitations." Id. at 00080. As to Plaintiff's subjective complaints, Dr. Klein cited the spinal osteoarthritic radiographic findings and the EMG tests that revealed right carpal tunnel syndrome to be mild. Id. at 00081. In Dr. Klein's view, Plaintiff's fibromyalgia "does not contribute to functional impairment since there is no associated neuromuscular dysfunction." Id. at 00081. Dr. Klein concluded that Plaintiff was capable of holding a sedentary job that did not require sustained walking, standing, or lifting. Id. at 00080, 00081.

Based upon Dr. Klein's conclusion, by letter dated August 30, 2010, Lincoln National notified Plaintiff of its determination that she was not "Totally Disabled," as defined in the LTD

Policy, citing the lack of clinical evidence in Plaintiff's medical records that would preclude her from performing her sedentary job. Id. at 00108-112.

By letter dated October 28, 2010, Plaintiff initiated a second appeal with additional medical records. Id. at 00089. Lincoln National retained Dr. Richard Tyler, a board certified orthopedist to review Plaintiff's records. On November 16, 2010, Dr. Tyler cited Plaintiff's various conditions since 2001 as fibromyalgia, generalized osteoarthritis of the upper and lower extremities, spinal osteopenia, osteoarthritis of both knees with total knee replacement of one knee, osteoarthritic changes to the cervical and lumbar spine, rotator cuff tear of the left shoulder, and mild right carpal tunnel syndrome. Id. at 00084-85. Based on Plaintiff's medical records, Dr. Tyler concluded that Plaintiff was limited by her conditions, but remained capable of full-time sedentary work, with frequent sitting, occasional standing, walking with an accommodation of changing bodily position as necessary. Id. at 00085. Based on this report, Lincoln National affirmed its determination that Plaintiff did not met the LTD Policy definition of Total Disability because Plaintiff was able to perform each of the main duties of her own occupation. Id. at 00075.

## B. CONCLUSIONS OF LAW

Under ERISA, judicial review of the denial of benefits under ERISA is "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the language of the plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, then the arbitrary and capricious standard applies. Id. For the arbitrary and capricious standard of review, the plan must contain 'a clear grant of discretion [to the administrator] to determine

15

benefits or interpret the plan.'" Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir.

1998)(en banc)(quoting Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir.

1994)(emphasis in original)).

Here, the relevant plan language provides that Lincoln Nations shall:

(1)     establish and enforce procedures for administering this [LTD]
        Policy and claims under it;

(2)     determine Employees' eligibility for insurance and entitlement to
        benefits;

(3)     determine what information the Company reasonably requires to
        make such decision; and

(4)     resolve all matters when a claims review is requested.

(Docket Entry No. 12-1, Administrative Record 00050).

This language in the Plan is sufficiently clear and express to grant discretionary authority

to Lincoln National to decide claims for Plan benefits. See Univ. Hosps. of Cleveland v.

Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000) (applying the arbitrary and capricious

standard where that plan provided that the plan's administrator "shall have the discretionary

authority to determine eligibility for benefits or to construe the terms of the Plan"). Accordingly,

the Court concludes that the arbitrary and capricious standard applies here.

"The arbitrary and capricious standard is the least demanding form of judicial review."

Hunter v. Caliber Sys., Inc., 220 F.3d 702, 710 (6th Cir. 2000). Yet, the Sixth Circuit clearly

stated that the arbitrary and capricious standard is not the equivalent of total deference to plan

administrators:

> [M]erely because our review must be deferential does not mean our review must
> also be inconsequential. While a benefits plan may vest discretion in the plan
> administrator, the federal courts do not sit in review of the administrator's
> decisions only for the purpose of rubber stamping those decisions. As we
> observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us

> merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life
> Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004). Indeed, "[d]eferential review is not no
> review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task
> at all events is to "review the quantity and quality of the medical evidence and the
> opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). In conducting an arbitrary and

capricious review of the administrative record, only the facts known to the administrator or

fiduciary at the time it made the decision are considered. Id. at 378-79.

The administrator's decision must be "based on a reasonable interpretation of the plan,"

and it must be "possible to offer a reasoned explanation, based on the evidence, for a particular

outcome." Evans, 434 F.3d at 876 (quoting Perry v. United Foods & Commercial Workers Dist.

Unions 405 & 422, 64 F.3d 238, 241 (6th Cir. 1995)). The administrator's decision "will be

upheld 'if it is the result of a deliberate reasoned process and if it is supported by substantial

evidence." Evans, 434 F.3d at 876 (quoting Baker v. United Mine Workers of America Health &

Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991)). This judicial review "inherently includes

some review of the quality and quantity of the medical evidence and the opinions on both sides of

the issue." Evans, 434 F.3d at 876 (quoting McDonald, 347 F.3d at 172). As a general rule, the

administrator's written decision and the information in the administrative record are the bases for

judicial review. Peruzzi, 137 F.3d at 433-34. If an ERISA administrator hand-picks among the

medical evidence, then the administrator acts arbitrarily and capriciously. See Smith v.

Continental Cas. Co., 450 F.3d 253, 261 (6th Cir. 2006) (ERISA administrator that "hand picked"

information provided to peer reviewer was arbitrary and capricious); Glenn v. Metlife, No. 05-

3918, 2006 WL 2519293, at *10 (6th Cir. Sept. 1, 2006) (the failure to consider evidence offered

after an initial denial of benefits in denial of benefits is arbitrary and capricious).

Here for her arbitrary and capricious contention, Plaintiff argues that Lincoln National's consultants did not examine Plaintiff; conducted only a paper-review of Plaintiff's medical records; and did not confer with Plaintiff's physician. "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." Kalish v. Liberty Mutual, 419 F.3d 501, 508 (6th Cir. 2005). The Sixth Circuit has noted that there is nothing inherently improper with relying on a physician's file review, even the consulting physician disagrees with the treating physician, Calvert v. Firstar Fin., Inc., 409 F.3d 286, 297 n.6 (6th Cir. 2005), but observed, "we find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." Id. at 395. Moreover, "[w]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." Kalish, 419 F.3d at 507 (citation omitted). See also McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 170 (6th Cir. 2003) ("The evidence presented in the administrative record did not support the denial of benefits when only [the administrator]'s physicians, who had not examined [the claimant], disagreed with the treating physicians."). A fiduciary must evaluate its expert's opinion and determine that its expert's opinion is justified under the circumstances. Gregg v. Transportation Workers of America International, 343 F.3d 833, 841 (6th Cir. 2003).

The United States Supreme Court has held that a plan administrator does not have an obligation to afford a treating physician's opinion more weight than a non-treating physician. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). In Nord, the Supreme Court recognized that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled, so a treating physician, in a close case, may favor a finding of disabled.'" Nord,

538 U.S. at 832. The administrator, however, may not arbitrarily refuse to consider the opinions of treating physicians. Id. at 834. The Sixth Circuit has explicitly recognized the possibility of a treating physician exaggerating the claimant's condition to assist him or her in obtaining benefits. Eastover Mining Co. v. Williams, 338 F.3d 501, 510 (6th Cir. 2003) ("[T]reating physicians may have strong proclaimant biases and lack the expertise held by non-treating doctors.").

Lincoln National found Plaintiff able to perform sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met." Brooking v. Hartford Life Ins. Co., 167 Fed. Appx. 544, 549, n. 5 (6th Cir. 2006). Where a group long term disability policy grants a claim administrator discretion to interpret its terms and does not include a definition of "own occupation," it is reasonable and not arbitrary and capricious for a claim administrator to use the Department of Labor's Dictionary of Occupational Titles to determine the claimant's "own occupation." Osborne v. Hartford Life & Acc. Ins. Co., 465 F.3d 296, 299-300 (6th Cir. 2006); accord Boone v. Liberty Life Assur. Co. of Boston, 2007 WL 1651989, at *6 (W.D. Ky. June 4, 2007).

In the two administrative appeals, the Defendant provided the following reasons for denial of Plaintiff's application.

### [First Appeal]

The medication documentation reviewed by Dr. Milton Klein indicated that your client self-reported diffuse musculoskeletal pain, cervical/lumbar pain, bilateral knee pain and bilateral carpal tunnel syndrome (CTS). It was noted in the review that there was documented evidence of diffuse osteoarthritis; however there was no associated functional range of motion impairment and no documented neurologic impairment to support the attending physicians' work activity

restrictions and limitations. Ms. Edwards' complaints were noted not to be consistent with the medical evidence submitted. The radiographic findings were considered mild and the right CTS was also mild based upon the two prior electrodiagnostic studies. Claims of fibromyalgia did not contribute to functional impairment since there was no associated neuromuscular dysfunction. It was noted in the review that the restrictions and limitations placed upon Ms. Edwards's work activities by the attending physician were not reasonable or consistent with the medical findings.

### [Second Appeal]

Dr. Tyler notes that Ms. Edwards has multiple chronic musculoskeletal complaints and that records reviewed dated back to 2001. He indicates that Ms. Edwards' has been seen by multiple clinicians for fibromyalgia, generalized osteoarthritis, chronic osteopenia of the spine, osteoarthritis of both knees, spondylosis of the cervical and lumbar spine, rotator cuff tear of the left shoulder and mild carpal tunnel syndrome of the right wrist. He notes she has a history of a right total knee replacement and three surgical procedures on the lumbar spine. He further notes that she presents with residual non-occlusive thrombosis in the right leg, for which she has been on chronic anti-coagulation therapy. Dr. Tyler indicated that Ms. Edwards' has been treated chronically for lupus, although it is not certain that she does in fact have lupus, rheumatoid arthritis or any confirmed collagen disease.

Dr. Tyler opines that based upon information in the file, your client has residual capacity for full time sedentary level of physical activity, with frequent sitting, occasional standing, walking, with accommodation for changing bodily position as necessary. Restrictions and limitations also include occasional overhead use of the left shoulder occasional bending, twisting, stooping; no squatting, kneeling, crawling. She has bilateral wrist splints which should be used as necessary. He concludes that with these restrictions and limitations, Ms. Edwards has had the capacity for full time sedentary level of work from 11/04/2009 forward.

In summary, we find that the medical documentation does not support that there are restrictions and limitations that would render your client unable to perform her own occupation, and we therefore find that your client was not Totally disabled under the terms of our policy as of 8/06/2010.

(Docket Entry No. 12-1, Administrative Record 00074, 00075).

In her first appeal, Dr. Burbank opined that Plaintiff could sit only four to five hours of an eight hour day, one hour at a time and could stand or walk only one hour for only ten to fifteen minutes at a time. (Docket Entry No. 12-1 at 00126). In an earlier March 8, 2004 questionnaire "Medical Source Statement of Ability To Do Work-Related Activities (Physical),"

Dr. Burbank opined that Plaintiff could not walk more than 150 feet without stopping because of back and knee pain. Plaintiff's ability to sit is limited to sitting one hour straight before switching positions. Id. at 00182. Dr. Burbank opined that Plaintiff could set for a total of four hours in an eight hour day. Id. For these conclusions, Dr. Burbank listed Plaintiff's diagnoses without reference to diagnostic tests/studies, other clinical evidence or her own or another provider's observations. Id. at 00183. Dr. Allen listed restrictions and limitations of no lifting more than 10 pounds; no repetitive lifting, bending, stooping or twisting; any prolonged sitting or standing more than thirty minutes; and no overhead work. (Docket Entry No. 12-4, Administrative Record 00692). With these restrictions, Dr. Allen opined that Plaintiff was completely disabled from her own job and from any other job. Id.

To be sure, the MRI of Plaintiff's cervical spine showed only "bilateral mild foraminal stenosis and moderate C5-6 central stenosis" and a "mild degree of spinal osteoarthritis." (Docket Entry No. 12-1, Administrative Record 00080, 00081). The May 14, 2010 MRI also showed moderate foraminal stenosis at both C4-5 and C5-6, and described the osteophyte formation as "exuberant." Id. at 00217. Plaintiff's EMG and x-rays and surgery reflect objective bases for Plaintiff's physicians' opinions on her ability to work.

Here, with Plaintiff's pain as the central basis for her disability, Plaintiff's fibromyalgia is the key consideration, given Plaintiff's other documented pain sources. As a matter of law, courts have held that an ERISA administrator's reliance on the lack of objective medical evidence is arbitrary and capricious where the claimant's illness or sickness cannot be objectively determined. As the Sixth Circuit aptly stated in an ERISA action: "As many courts have observed, pain often evades detection by objective means." Brooking v. Hartford Life & Accident Ins. Co., 167 Fed. Appx. 544, 549 (6th Cir. 2006); accord Mitchell v. Eastman Kodak, 113 F.3d 433, 442-43 (3d Cir.

21

19970 (Chronic Pain Syndrome); see also <u>Kosibu v. Merck & Co.</u>, 384 F.3d 58, 62 n.3 (Fibromyalgia); <u>Green-Younger</u>, 335 F.3d 99, 108 (2d Cir. 2002) (fibromyalgia). In <u>Yearger v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376, 381-82 (6th Cir. 1996), the Sixth Circuit held that only medical evidence of a diagnoses of such a condition is necessary to find a disability from such an illness.

Among Plaintiff's "chief complaints' at the time of her LTD application is fibromyalgia. In <u>Preston v. Secretary of Health and Human Serrvs.</u>, 854 F.2d 815 (6th Cir. 1988) (<u>per</u> <u>curiam</u>), the Sixth Circuit described fibromyalgia as a medical condition that cannot be discerned by any objective medical tests.

> fibrositis[1] causes **severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results- - a full range of motion, no joint swelling,** as well as normal muscle strength and neurological reactions. **There are no objective tests which can conclusively confirm the disease**; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. **The disease commonly strikes between the ages of 35 and 60 and affect women nine times more than men.**

<u>Id.</u> at 817-18 (emphasis added).

For fibromyalgia, the Sixth Circuit deemed objective medical tests to be "little aid or relevance" except for other medical diseases that have objective manifestations. <u>Id.</u> at 820. Moreover, "fibrositis patients . . . cannot sit, stand, or maintain any one position for any length of time," <u>id.</u> at 818, but patients with this condition do have "good days," but these days are "extremely rare," <u>id.</u> at 819. In <u>Preston</u>, the Court deemed persuasive evidence of disability to

---

[1]

In <u>Brazier v. Secretary of Health and Human Services,</u> 61 F.3d 903, 1995 WL 418079, the Sixth Circuit noted that "fibromyalgia is often interchangeably used with the terms fibromyositis or fibrositis." <u>See</u> <u>Lisa v. Secretary of Health and Human Servs.</u>, 940 F.2d 40, 43 (2d Cir. 1991).

include the "systematic elimination of other diagnosis, identification of focal tender points and observation of other classic symptoms of fibrositis . . ." Id. at 820.

The Sixth Circuit in Huffaker v. Metropolitan Life Ins. Co., 271 Fed. Appx. 493 (6th Cir. 2008), addressed this proposition with respect to the condition Plaintiff claims here – fibromyalgia. In Huffaker, the Sixth Circuit reasoned:

> A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective. But objective evidence of disability due to fibromyalgia can be furnished by the claimant without the same level of difficulty."

Huffaker, 271 Fed. Appx. at 500 (citing Boardman v. Prudential Ins. Co., 337 F.3d 9, 16-17 n. 5 (1st Cir. 2003))(italics in original). Indeed, as the Sixth Circuit pointed out, the First Circuit in Boardman held that "While the diagnos[is] of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness[ ] do lend themselves to objective analysis." Huffaker, 271 Fed. Appx. at 500.

In Sarchet v. Chater, 78 F.3d 305, 306, 307 (7th Cir. 1996), the Seventh Circuit cited the inherent difficulties of evaluating a claim of disability due to fibromyalgia - - a disease whose "symptoms are entirely subjective" because laboratory tests will not show the presence or severity of this disease, but the person can be "totally disabled from working." Courts look for trigger points, that when pressed, cause the patient to flinch. Preston, 854 F.2d at 818; Sarchet, 78 F.3d at 306. The Seventh circuit cited eleven trigger points as an indication of the presence of this disease, but the Sixth Circuit has not cited any number. Id.

Given Plaintiff's fibromyalgia, the Court concludes that Plaintiff could not present objective medical evidence of that condition, but did present corroborative medical evidence from her treating physicians that under Yearger is sufficient. Lincoln National's consulting physician conceded Plaintiff's diagnosis of fibromyalgia and her chronic pain. Plaintiff's

fibromyalgia, coupled with the other documented of medical causes of pain, establish and support Plaintiff's physicians assessment of her long term disability. Thus, the Court concludes that Lincoln National's rejection of the treating physicians' opinions on Plaintiff's ability to work was arbitrary and capricious, given the Sixth Circuit's precedent that fibromyalgia cannot be objectively measured by medical tests.

As to whether to award attorney fees, in Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust, 203 F.3d 926 (6th Cir. 2000), the Sixth Circuit listed the factors to be considered:

> Under 29 U.S.C. § 1132(g)(1) a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must consider the following factors in deciding whether to award attorney fees, (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions. Schwartz v. Gregori, 160 F.3d 1116, 1119 (6th Cir. 1998) (quoting Secretary of Dep't of Labor v. King, 775 F.2d 666, 669 (6th Cir. 1985)), cert. denied, 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999).

Id. at 936. The Court reserves this issue to allow the parties an opportunity to analyze these factors.

An appropriate Order is filed herewith.

**ENTERED** this the ⟶25ʳᵈ day of May, 2012.

WILLIAM J. HAYNES, JR.
United States District Judge